**F I L E D**

PUBLISH

**OCT 31 2002**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LINDA ARNDT,

        Plaintiff - Appellant,

  v.

THOMAS KOBY and MARK
BECKNER, individually and in their
official capacity; THE CITY OF
BOULDER, a municipal corporation,

        Defendants - Appellees.

No. 01-1356

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 98-WY-1198-WD)**

---

A. Bruce Jones, Holland & Hart, Denver, Colorado (Conor F. Farley, Holland &
Hart, Denver, Colorado, and Judith A. Biggs, Holland & Hart, Boulder, Colorado,
with him on the briefs), for Plaintiff-Appellant.

Leslie L. Schluter (Sue Ann Haskell with her on the brief), Brooks & Schluter,
Denver, Colorado, for Defendants-Appellees.

---

Before **BRISCOE** , **ANDERSON** , and **O'BRIEN** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

Plaintiff Linda Arndt filed suit against her employer, the City of Boulder, Colorado, its police chief and his successor, asserting a violation of her First Amendment free speech rights, as well as violations of Colorado state law. The district court granted summary judgment to the defendants on the Colorado state law claims, and granted judgment as a matter of law on her 28 U.S.C. § 1983 First Amendment claim. She appeals those rulings, which we affirm.

## BACKGROUND

Six-year-old JonBenet Ramsey was murdered inside her home in Boulder, Colorado, on December 26, 1996. Ms. Arndt, at that time a detective with the Boulder Police Department, was one of the first officers to arrive at the crime scene, the Ramsey home, and was the only officer present when the child's body was found. Ms. Arndt was involved in the murder investigation until she was removed from the case in May 1997 by defendant Thomas Koby, then the Boulder Police Chief.

While she was involved in the investigation, and continuing for some period of time following her removal from the case, Ms. Arndt and other officers involved in the Ramsey murder investigation were widely criticized in the media. The criticisms generally alleged that Ms. Arndt and others had made mistakes and otherwise mishandled the investigation, which contributed to the police

department's inability to identify and apprehend a suspect. She asserts that these criticisms were false and harmed her reputation. She alleges that she discussed these criticisms with Chief Koby and others. Neither Chief Koby nor anyone else in the police department took any action regarding these alleged criticisms. Additionally, Chief Koby imposed a gag order prohibiting anyone in the Boulder police department from speaking to the media about the Ramsey investigation.

Ms. Arndt then retained an attorney, R. Brooke Jackson, who, in October 1997, wrote a letter to Chief Koby listing eight allegedly false statements made about Ms. Arndt. In particular, the letter stated that:

> [N]o one within the Department has made any effort of which we are aware to stand behind Linda publicly, to correct the factual errors being made, or otherwise to support her. Her reputation has been harmed and continues to be harmed. She has been allowed to become a scapegoat, if not the primary scapegoat, by a continuous series of statements about one thing or another that she supposedly did that are simply false.

Def.'s Ex. B, Appellant's App. Vol. I at 124. In a subsequent telephone conversation, Mr. Jackson asked Chief Koby to either defend Ms. Arndt or allow her to speak out herself to respond to the criticism. Chief Koby declined.

Ms. Arndt filed her complaint on May 19, 1998, while still employed by the police department. She asserted a violation of her First Amendment right to speak out on a matter of public concern, based on the fact that she was prevented by the gag order from publicly responding to the allegedly false and harmful

media statements about her. She also alleged a Colorado constitutional claim as well as a state law claim for false light invasion of privacy. [1]

She quit the department on May 1, 1999. Defendants [2] filed motions to dismiss and for summary judgment, which the district court denied on November 30, 2000, concluding that Ms. Arndt's complaint sufficiently stated a claim for relief such that "[it] would be inappropriate for the Court to engage in the applicable balancing test at this stage of the proceedings." Appellant's App. Vol. 1 at 52-53.

In March 2001, defendants filed a second motion for summary judgment which the court granted in part and denied in part. The court granted summary judgment to defendants on Ms. Arndt's state law claims. The case proceeded to trial on May 29, 2001, on the First Amendment claim. On June 4, defendants filed a motion for judgment as a matter of law. On June 11, the court heard arguments on the motion and on June 12, at the close of Ms. Arndt's case-in-chief, it granted the motion, concluding that the speech Ms. Arndt alleged she was

---

[1]At oral argument of this appeal, Ms. Arndt's attorney conceded that a recent decision by the Colorado Supreme Court in The Denver Publ'g Co. v. Bueno, No. 01SC386, 2002 WL 31097976 (Colo. Sept. 16, 2002), eliminated Ms. Arndt's state law false light invasion of privacy claim.

[2]Mark Beckner was added as a defendant when he succeeded Chief Koby as Chief of the Boulder Police Department.

prevented from making was not on a matter of public concern, as required for Ms. Arndt's claim to succeed under applicable case law.

Ms. Arndt appeals, arguing (1) the district court erred in holding that her proposed speech was not on a matter of public concern; (2) the balancing required under United States v. Nat'l Treas. Employees Union, 513 U.S. 454 (1995) ("NTEU") and Pickering v. Bd. of Educ., 391 U.S. 563 (1968) must be conducted by a jury on remand; and (3) the district court erred in dismissing her claim under the Colorado Constitution.

## DISCUSSION

"We review the district court's grant of judgment as a matter of law *de novo*, using the same standard as the district court." Lantec, Inc. v. Novell, Inc., No. 01-4109, 2002 WL 31087822, at *15 (10th Cir. Sept. 19, 2002). Accordingly, "[j]udgment as a matter of law 'is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'" Id. (quoting Baty v. Willamette Indus., Inc., 172 F.3d 1232, 1241 (10th Cir. 1999) (further quotation and citation omitted)). Further, "'if there is no legally sufficient evidentiary basis with respect to a claim . . . under the controlling law,'" we must affirm the grant of judgment as a matter of law to the

party prevailing below. Id. (quoting Baty, 172 F.3d at 1241) (further quotation and citation omitted)).

We review the grant of summary judgment de novo, applying the same standard as did the district court. PeTA, People for the Ethical Treatment of Animals v. Rasmussen, 298 F.3d 1198, 1203 (10th Cir. 2002). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In cases involving the First Amendment, the de novo standard is 'appropriate . . . for the further reason that . . . [i]n cases raising First Amendment issues . . . an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.'" Horstkoetter v. Dep't of Pub. Safety, 159 F.3d 1265, 1270 (10th Cir. 1998) (quoting Lytle v. City of Haysville, 138 F.3d 857, 862 (10th Cir. 1998) (further quotation omitted)).

It is well established that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick v. Myers, 461 U.S. 138, 142 (1983) (citations omitted); see also NTEU, 513 U.S. at 465; Bass v. Richards, No. 01-1202, 2002 WL

1859034, at *5 (10th Cir. Aug. 14, 2002); Koch v. City of Hutchinson, 847 F.2d 1436, 1440 (10th Cir. 1988) (en banc).  However, when the government acts as an employer, "the First Amendment does not apply with full force." Horstkoetter, 159 F.3d at 1271.  Thus, the government as employer "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." NTEU, 513 U.S. at 465.  If the government restrains the free speech rights of its employees, we assess the validity of that restraint by balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.  Accordingly, "private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer." NTEU, 513 U.S. at 466.  Restrictions or sanctions on employee speech on matters of public concern, by contrast, impose upon the government "the burden of justifying its adverse employment action." Id.; see also Rankin v. McPherson, 483 U.S. 378, 388 (1987).

Pickering and Connick and subsequent cases applying their balancing test involved an employee challenge to the constitutionality of an adverse employment action previously taken in response to speech already made. NTEU, on the other

-7-

hand, involved a prior restraint imposed by the government upon employee speech: "unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens." NTEU, 513 U.S. at 468. This case too involves a prior restraint, although it involves a restraint of far less breadth and involves far fewer employees than the restraint at issue in NTEU. In such a case involving a prior restraint of employee speech, while the Pickering/Connick balancing test applies, it is modified:

> [T]he government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action. The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the Government.

NTEU, 513 U.S. at 468 (quoting Pickering, 391 U.S. at 571). [3]

_____

[3]NTEU addressed the constitutionality of a federal law prohibiting federal employees from accepting honoraria for speeches or articles. The Supreme Court acknowledged that the breadth of the ban on speech, and the fact that it constituted a prior restraint of such speech, distinguished it from the Court's prior applications of Pickering's balancing test: "The honoraria ban as applied to respondents burdens speech far more than our past applications of Pickering because the ban deters an enormous quantity of speech before it is uttered, based only on speculation that the speech might threaten the Government's interests." NTEU, 513 U.S. at 467 n.11.

Given our disposition of this case, we need not determine whether NTEU's imposition of a greater burden on the government to justify its restraint of employee speech depends upon all of the factors present in that case–a broad statutory ban which operated as a prior restraint applicable to a very large group
(continued...)

-8-

In any event, under the Pickering balancing test, whether modified or not, the threshold inquiry in analyzing the constitutionality of a governmental restriction on employee speech is whether the particular speech at issue was on a matter of public concern. That is a question of law for the court to determine. Bass, 2002 WL 1859034, at *5. "A matter is of public concern . . . if it is 'of interest to the community, whether for social, political, or other reasons.'" Horstkoetter, 159 F.3d at 1271 (quoting Lytle, 138 F.3d at 863). By contrast, speech of purely personal interest, or involving internal personnel disputes, is not of public concern. See id.; see also Bass, 2002 WL 1859034, at *5.

In determining whether employee speech addresses matters of public concern we examine "the content, form and context of a given statement, as revealed by the whole record," bearing in mind that our object is to distinguish

---

³(...continued)
of employees–or whether any of those factors, or some combination thereof, justify the greater burden. Cf. Latino Officers Assoc. v. City of New York, 196 F.3d 458, 464 (2d Cir. 1999) ("Application of the NTEU standard turns on whether a government employee's expression is restricted 'through a generally applicable statute or regulation, as opposed to a particularized disciplinary action.'") (quoting Weaver v. United States Info. Agency, 87 F.3d 1429, 1439 (D.C. Cir. 1996)); see also Swartzwelder v. McNeilly, 297 F.3d 228, 236-37 (3d Cir. 2002) (discussing NTEU and Pickering and following the Second Circuit analysis in Latino Officers Assoc.); Shelton Police Union, Inc. v. Voccola, 125 F. Supp. 2d 604, 623 (D. Conn. 2001) ("[T]he government's burden of demonstrating that its interests outweigh the interests of the speakers is greater in cases involving a prior restraint as opposed to cases involving isolated disciplinary action.").

between "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." Connick, 461 U.S. at 147-48. We turn, therefore, to the content, form and context of Ms. Arndt's proposed speech in this case.

As indicated, Ms. Arndt, as well as various other members of the Ramsey investigative team, had been criticized by the media for the way in which the Ramsey investigation proceeded. Ms. Arndt sought to either have Chief Koby issue a brief statement refuting alleged inaccuracies concerning Ms. Arndt's conduct in the Ramsey investigation, or, if he refused, she sought permission to make such a statement, despite the gag order barring any statements to the media. Thus, the content of Ms. Arndt's proposed speech was a refutation of allegations impugning her reputation.

After carefully reviewing the entire record in this case, we conclude that the content of Ms. Arndt's speech supports the conclusion that her proposed speech addressed purely personal concerns, not matters of public concern. Beginning with her complaint, and continuing through depositions and her trial testimony, Ms. Arndt's own averments, statements and testimony indicate she sought, through her proposed speech, to clear her personal reputation and restore her personal good name.

Her complaint avers the following:

13. A number of purported facts about Detective Arndt's actions have been published, often more than once, and often after she stopped working on the case, in the print and/or broadcast media.

. . .

16. The publication and broadcast of such false statements sullied the reputation Detective Arndt had earned as a police officer and detective.

17. These publications and broadcasts have either stated or implied that Detective Arndt "bungled" the investigation in its early stages and is partly, if not largely, responsible for the problems that have plagued the investigation of the Ramsey murder.

18. The Boulder Police Department, and Defendant Koby in particular, were aware, during the entire period of time when such media publications and broadcasts were being made and re-made, that these statements about Detective Arndt were untrue and were creating an unfair and damaging public perception about Detective Arndt's role in the Ramsey investigation.

First Am. and Supp. Compl. at ¶¶ 13-18, Appellant's App. Vol. I at 34-36 (emphasis added). The complaint continues to emphasize that Ms. Arndt's concern, and the speech in which she sought to engage to alleviate that concern, was about the alleged harm to her alone.

Chief Koby's testimony supports this view of Ms. Arndt's proposed speech. He testified that "Linda never, to my knowledge, expressed concern about the other members of the team. It was always what her concern is, her this, and her that." Dep. of Chief Koby at 127, id. at 147. Ms. Arndt testified that when her

-11-

attorney, Mr. Jackson, contacted Chief Koby to inquire about making a statement on Ms. Arndt's behalf, she wanted "[a] brief statement saying that the statements about me were false." Dep. of Ms. Arndt at 268, id. at 325 (emphasis added). When asked, "[i]t was your reputation you were concerned with, right?" Ms. Arndt responded, "[s]ure was." Id. at 269. [4] Moreover, Ms. Arndt testified repeatedly that she simply wanted Chief Koby to deny the eight specific instances of alleged misconduct by Ms. Arndt detailed in Mr. Jackson's letter, or, if Chief Koby refused to so deny them, she wanted the opportunity to deny them herself. [5] Each of those eight allegations related solely and specifically to Ms. Arndt, not the Boulder police department in general or other participants in the Ramsey

---

[4]For example, in explaining why she discussed with a television news show producer the possibility of appearing on a national morning news program, Ms. Arndt testified it was because "[t]here was no, no attempt[] by the Boulder Police Department to ever clear my name." Dep. of Ms. Arndt at 17, Appellant's App. Vol. I at 261 (emphasis added).

[5]At trial the following interchange occurred during cross-examination of Ms. Arndt:

> Q  . . . There were eight points listed in the Brooke Jackson letter, correct?
> A  Yes.
> Q  Brooke Jackson just wanted Chief Koby to deny those eight allegations, correct?
> A  Yes.
> Q  And if Chief Koby wasn't willing to do that, he wanted the opportunity for you to deny those with allegations, correct?
> A  Yes.

Tr. at 1230-31, Appellant's App. Vol. X.

investigation. All of this evidence indicates, therefore, that her proposed speech was that of "an employee [seeking to speak] upon matters only of personal interest," not a "citizen upon matters of public concern." Connick , 461 U.S. at 147.

Ms. Arndt argues that, even if the content of her speech primarily sought to restore her personal reputation, "the performance and integrity of a highly visible public official" necessarily is a matter of public concern. Appellant's Opening Br. at 23. While we agree that the performance and integrity of a public official could be a matter of public concern, that is not always so. See Koch, 847 F.2d at 1447 (noting that a public employee's "own competence to perform his job could be a matter of public concern.") (emphasis added). "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark–and certainly every criticism directed at a public official–would plant the seed of a constitutional case." Connick , 461 U.S. at 149; see also Hesse v. Bd. of Educ. of Township High Sch. Dist. No. 211 , 848 F.2d 748, 751-52 (7th Cir. 1988) ("While it cannot be gainsaid that educational policies in a public school are matters of public concern, all but one of the plaintiff's memoranda and statements were directed to the defense of his personal teaching methods and his resentment of the evaluations and criticisms of those methods."). The fact that Ms. Arndt was a police detective working on a murder

investigation which had garnered tremendous media attention does not alone transform her speech designed to refute media criticisms of her personal, individual competence in that particular investigation into speech on a matter of public concern.

Ms. Arndt also argues that the form and context of her proposed speech–a public response to media coverage of a sensational murder investigation–somehow transforms her personal and specific desire to restore her reputation into a matter of public concern. We disagree.

While it is true that the Ramsey investigation was the subject of intense media interest, that alone will not convert speech in some way connected to such an investigation into speech of public concern. See Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1233 (10th Cir. 1998) ("Media publicity of a dispute is not determinative of whether a public employee's speech was a matter of public concern."); Koch, 847 F.2d at 1445 (noting that "what is of general interest to the public is not necessarily of public concern for First Amendment purposes"). Further, the fact that she wished to respond publicly to media criticisms does not necessarily indicate that her speech touched a matter of public concern. See Lancaster, 149 F.3d at 1233 (holding that an employee's comments made to a newspaper were not on a matter of public concern). Thus, neither the form nor the context of her proposed speech compel the conclusion that her proposed

-14-

speech was on a matter of public concern for First Amendment purposes. They do not overcome the fact that the content of her speech overwhelmingly supports the conclusion that her speech was purely personal.

Finally, Ms. Arndt argues that the district court improperly gave, and defendants urge us to improperly give, decisive weight to her motive in speaking. She argues that our court has held that motive is not determinative. We agree that an employee's subjective motivation, standing alone, is not determinative. Rather, we look at motive as a way to help us assess the content of the speech "to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Gardetto v. Mason, 100 F.3d 803, 812 (10th Cir. 1996); see also Lighton v. Univ. of Utah, 209 F.3d 1213, 1224 (10th Cir. 2000). Ms. Arndt's proposed speech was clearly "calculated to redress personal grievances." Gardetto, 100 F.3d at 812. Thus, the fact that Ms. Arndt was motivated to salvage her personal reputation, and that her proposed speech was tailored to achieve that goal, supports our assessment that her proposed speech addressed purely personal and individual concerns.

In sum, we conclude that the district court correctly held that Ms. Arndt's proposed speech did not address matters of public concern and was accordingly not protected by the First Amendment. We therefore need not address the Pickering/NTEU balancing inquiry.

-15-

Ms. Arndt also argues the district court erred in granting summary judgment on her state law claims, of which only one remains on appeal. Ms. Arndt's remaining claim invokes the Colorado Constitution's free speech clause. See Colo. Const. art. II, § 10. The district court granted summary judgment to defendants on the claim, concluding that the existence of Ms. Arndt's § 1983 claim provided an adequate remedy such that a separate Colorado constitutional claim was "unnecessary." Tr. of Tel. Oral Ruling on Defs.' Second Mot. for Summ. J. at 5, Appellant's App. Vol. I at 353. We agree.

In Bd. of County Comm'rs v. Sundheim, 926 P.2d 545 (Colo. 1996) (en banc), the Colorado Supreme Court held that "[w]hile it may be appropriate to recognize an implied state constitutional cause of action when there is no other adequate remedy . . . where other adequate remedies exist, no implied remedy is necessary." Id. at 553. Section 1983 provides such an adequate remedy. The fact that Ms. Arndt ultimately has not prevailed on her section 1983 claim does not make it any less "available" as a legal remedy under Sundheim. See Brammer-Hoelter v. Twin Peaks Charter Acad., 81 F. Supp. 2d 1090, 1097-98 (D. Colo. 2000).

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the district court.